UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 19 CR 722-10 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| EDWARD HUMPHREY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Chicago Police Department officers stopped a car that Edward Humphrey was driving, searched his person, and found a sock containing about 80 grams of cocaine. Doc. 348-2 at p. 2, ¶ 9. Humphrey is charged with possession with intent to distribute cocaine, Doc. 383 at 29, and moves to suppress the incriminating evidence, Doc. 348. The motion is denied.

**Background**

As discussed below, there are no "disputed issues of material fact that will affect the outcome" of Humphrey's motion, so no evidentiary hearing is required. *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018). The following facts, which are undisputed for purposes of this motion, are drawn from the complaint affidavit, Doc. 1 at pp. 4-101; a Chicago Police Department ("CPD") narcotics supplementary report, Doc. 348-1; and a Drug Enforcement Administration ("DEA") report, Doc. 348-2.

Humphrey was stopped as part of a larger investigation into a drug trafficking organization ("DTO") led by Darrin Pulphus. Doc. 1 at p. 8, ¶ 8. The investigation included interceptions of calls to and from several phones used by Pulphus. *Id*. at p. 7, ¶ 6 & n.1. On April 10, 2019, Pulphus received a large shipment of cocaine from his supplier. *Id*. at pp. 79-80, ¶¶ 170-171. Intercepted phone calls and visual surveillance showed that Pulphus distributed the

1

cocaine to some of his primary lieutenants, including David Bowden and Lawrence Johnson. *Id*. at pp. 83-86, ¶¶ 177-178, 180-186. In one call, Bowden asked Pulphus, "[y]ou got it?," and Pulphus responded, "about 20 minutes." *Id*. at p. 80, ¶ 173.a. Twenty-four minutes later, officers saw Pulphus arrive at Bowden's home carrying a large gym bag. *Id*. at p. 83, ¶ 177. Pulphus called Bowden and said, "[o]pen the door, Dave," and Pulphus was let in. *Id*. at p. 83, ¶ 178. Immediately after leaving Bowden's home, Pulphus drove to a public location to meet Johnson and gave him a large bag. *Id*. at pp. 85-86, ¶¶ 183-186. When Johnson drove away, officers stopped him and seized the bag, which contained a kilogram of cocaine. *Id*. at pp. 86-87, ¶ 187.

The CPD officers' stop of Humphrey occurred the next morning, on April 11, 2019. At 8:53 a.m., Bowden told Pulphus in a telephone call that he was "about to meet Porsche," apparently someone's nickname, "in about 30 minutes." *Id*. at p. 88, ¶ 189. Surveillance officers Pearson, Hatch, and Malone located Bowden by 9:14 a.m. Doc. 348-1 at 2. Pearson followed Bowden as he drove to an eatery called Mather's Café, arriving there at 9:24 a.m. *Ibid*. At 9:57 a.m., Pulphus called Bowden again, and Bowden explained that his customer was "about to pull up." Doc. 1 at p. 88, ¶ 191. Two minutes later, Pearson saw Bowden exit Mather's Café and return to his vehicle in the parking lot. Six or seven minutes after that, at either 10:05 or 10:06 a.m., a Mercedes with a Chicago Bears license plate pulled up and parked next to Bowden. *Id*. at p. 89, ¶ 193; Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 6. Pearson watched as the driver of the Mercedes exited his car and entered Bowden's. Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 6. A minute or two later, at 10:09 a.m., the driver of the Mercedes got out, returned to his own car, and drove away. Doc. 1 at p. 89, ¶ 193; Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 7.

Hatch and Malone immediately began trailing the Mercedes as it traveled south. Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 7. (The record does not indicate whether Hatch and Malone observed the events at Mather's Café.) According to the CPD and DEA reports, minutes later, at 10:12 a.m., Hatch saw the Mercedes fail to come to a complete stop at a stop sign. Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 8. The CPD report states that this occurred at 85th Street and Martin Luther King Drive, while the DEA report states that it occurred 83rd Street and Martin Luther King Drive. *Compare* Doc. 348-1 at 2 *with* Doc. 348-2 at p. 2, ¶ 8. Humphrey points out that only 85th Street has a stop sign, while 83rd Street has a stop light. Docs. 348-5, 348-6. This inconsistency between the reports does not affect the outcome of Humphrey's motion to suppress.

Hatch "related" what he said was Mercedes's failure to come to a complete stop. Doc. 348-1 at 2. Two minutes later, at 10:14 a.m., two officers named Hall and Rodriguez pulled the Mercedes over in the 700 block of East 87th Street. *Ibid.*; Doc. 348-2 at p. 2, ¶ 9. It had been five minutes since the Mercedes left Mather's Café. Hall and Rodriguez told the driver, later identified as Humphrey, that he had failed to come to a complete stop at a stop sign. Doc. 348-1 at 2. They asked Humphrey to exit the vehicle, patted him down, and found a sock containing 80 grams of cocaine in his jacket pocket. *Ibid.*; Doc. 348-2 at p. 2, ¶ 9. They released him at 10:33 a.m. and terminated surveillance. Doc. 348-2 at p. 2, ¶ 10.

On September 17, 2019, the government filed a criminal complaint against Pulphus, Bowden, Johnson, Humphrey, and six others allegedly involved in some manner with the Pulphus DTO. Doc. 1. Humphrey was arrested the next day and released on bond on September 20. Docs. 61, 114. He and the others were charged by indictment on January 29, 2020, Doc. 192, and by superseding indictment on April 13, 2021, Doc. 383.

## Discussion

Humphrey moves to suppress the cocaine found on his person by Hall and Rodriguez as the fruit of an unlawful search; in the alternative, he moves for an evidentiary hearing. Doc. 348 at 1; Doc. 359 at 1. Subject to certain exceptions, the fruits of an unlawful search must be suppressed. *See United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011). The parties dispute whether the stop of Humphrey's car and the search of his person violated the Fourth Amendment.

Humphrey was stopped and searched without a warrant. "[T]he government [bears] the burden of proving by a preponderance of the evidence … that an exception to the warrant requirement applied." *United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018). Here, the government forgoes reliance on Humphrey's alleged traffic violation (failing to come to a complete stop at a stop sign) and argues instead that the stop was justified by probable cause to believe that he was in possession of cocaine. Doc. 352 at 8. The government thus invokes the exception to the warrant requirement for a search incident to an arrest supported by probable cause. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest.").

"An officer may make a warrantless arrest consistent with the Fourth Amendment if there is probable cause to believe that a crime has been committed." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (internal quotation marks and brackets omitted); *see also United States v. Sands*, 815 F.3d 1057, 1061-62 (7th Cir. 2015) (same). "[P]robable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Rainsberger v. Benner*, 913 F.3d 640, 648 (7th Cir. 2019). "Mere suspicion does not suffice to establish probable cause." *United States v. Hicks*, 650 F.3d 1058, 1065 (7th Cir.

4

2011). The standard is objective and based on what law enforcement knew at the time: "The officers' subjective intentions are irrelevant so long as there was probable cause to detain [the suspect] for any crime." *United States v. Brown*, 973 F.3d 667, 706 (7th Cir. 2020).

Humphrey argues that because Hall and Rodriguez did not witness the events at Mather's Café, they lacked the knowledge that would have given them probable cause to believe that he was in possession of cocaine. Doc. 359 at 3, 5-6. The government responds that the collective knowledge doctrine renders immaterial Hall and Rodriguez's level of personal knowledge about Humphrey's actions before the stop. Doc. 352 at 1, 7, 13 n.4.

The collective knowledge doctrine allows the knowledge of Officer A to be imputed to Officer B if Officer B takes action in reliance on representations or direction from Officer A. As the Seventh Circuit has explained, "so long as the facts and circumstances within an agency's collective knowledge warrant a prudent person in believing that the suspect had committed or was committing an offense, an officer of that agency, acting in good-faith reliance on such facts and circumstances, has probable cause to effectuate an arrest." *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (cleaned up); *see also United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) ("There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest—or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause."). The collective knowledge doctrine has three requirements: "(1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Williams*, 627 F.3d at 252-53.

Requirements (2) and (3) reflect the standard Fourth Amendment inquiry. Starting with those two requirements, the information known to law enforcement as a whole certainly gave probable cause to arrest Humphrey. The intercepted phone calls and in-person surveillance of Pulphus, Bowden, and Johnson made abundantly clear that those persons were distributing cocaine. On April 10, 2019, Johnson was found with a kilogram of cocaine in a bag given to him by Pulphus, who himself had just left Bowden's home. Doc. 1 at pp. 85-87, ¶¶ 183-187. Humphrey met Bowden the next morning, shortly after two phone calls in which Bowden told Pulphus that he was meeting a customer. *Id*. at p. 88, ¶¶ 189, 191. Officers saw Humphrey arrive in a Mercedes with a Chicago Bears plate, enter Bowden's vehicle, remain there for a minute or two, and then depart. Doc. 348-1 at 2. Common sense surely would have suggested to the officers that this brief rendezvous was unlikely to be a social engagement and far more likely to relate to Bowden's known drug trafficking. From that point forward, the officers never lost track of Humphrey, stopping his Mercedes five minutes later. *Ibid*. A prudent person would have believed that there was a fair probability, not a mere suspicion, that Humphrey at that point was in possession of cocaine given to him by Bowden. Requirements (2) and (3) of the collective knowledge doctrine are therefore satisfied. *See Howard*, 883 F.3d at 707; *Rainsberger*, 913 F.3d at 648.

Requirement (1) asks whether Hall and Rodriguez acted in "objective reliance" on information received from other officers. *Williams*, 627 F.3d at 252. This requirement does not demand that Hall and Rodriguez, the arresting officers, were told details of the facts giving probable cause to believe that Humphrey was in possession of cocaine. Rather, the reliance requirement demands only that Hall and Rodriguez acted at the direction of other officers who had knowledge of those facts. In *United States v. Hensley*, 469 U.S. 221 (1985), the seminal

6

Supreme Court decision on the collective knowledge doctrine, the arresting officers knew only that the suspect was named in a "wanted flyer" issued by another police department. *Id*. at 223. The flyer did not set forth "the specific and articulable facts which led the first department to suspect [the defendant's] involvement in a completed crime." *Id*. at 230. The Supreme Court held that the flyer's omission of those facts had no legal significance:

> [W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.

*Id*. at 231 (emphasis in original). *Hensley* shows that objective reliance does not require a transfer of specific information about the alleged criminal conduct from the investigating officers to the arresting officers.

In *United States v. Gary*, 790 F.3d 704 (7th Cir. 2015), the Seventh Circuit issued a similar ruling that parallels the facts of this case even more closely. The arresting officers in *Gary* "stopped the car because a narcotics detective gave them the license plate number and told them to make a stop if they observed any [traffic] violations." *Id*. at 706. The arresting officers "had no personal knowledge of [the narcotics] investigation," but "[t]hey stopped the vehicle at the direction of a narcotics detective." *Ibid*. The Seventh Circuit held that "knowledge of the investigation [could] be imputed to the arresting officers through the collective knowledge doctrine" under those circumstances. *Ibid*.

Construing all ambiguities in Humphrey's favor, the police reports here recount a similar set of circumstances. Hall and Rodriguez may not have known what transpired at Mather's Café. But the record makes clear that Hatch and Malone began following the Mercedes because it had recently left the suspected drug transaction. Doc. 348-1 at 2; Doc. 348-2 at p. 2, ¶ 7. Hatch then "related" what he said was the Mercedes's failure to come to a complete stop at a stop sign,

7

Doc. 348-1 at 2, and Hall and Rodriguez pulled the Mercedes over shortly thereafter. Hall and Rodriguez may not have known much, if anything, about Humphrey's involvement with a suspected cocaine transaction at Mather's Café, but they knew from their colleagues that they were supposed to stop the Mercedes. It follows under *Hensley* and *Gary* that knowledge from the broader investigation may be imputed to Hall and Rodriguez.

The Seventh Circuit regularly applies the collective knowledge doctrine to reach the same result on comparable facts. *See United States v. Street*, 917 F.3d 586, 596 (7th Cir. 2019) (holding that the "Constitution permits officers to stop a person based on 'wanted' bulletins issued by other law enforcement agencies even if [the] officer making [the] stop lacks personal knowledge of [the] basis" for the bulletins); *Williams*, 627 F.3d at 253 (holding that the collective knowledge doctrine applied where "DEA agents asked local law enforcement officers to stop a specifically-identified vehicle, and the local officers had no knowledge of the facts underlying the DEA's probable cause"); *United States v. Randall*, 947 F.2d 1314, 1319 (7th Cir. 1991) ("The police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency."); *United States v. Celio*, 945 F.2d 180, 183 (7th Cir. 1991) (applying the collective knowledge doctrine where state law enforcement "conducted its search on the bald assertion by the federal agents that they suspected drug trafficking"); *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987) ("The requesting DEA agent had good grounds for articulable suspicion and the detaining officer had a reasonable basis for believing the request to be well-founded— even though she did not personally know the facts giving rise to the suspicion.").

The one possible wrinkle is the Seventh Circuit's statement in *United States v. Nafzger*, 974 F.2d 906 (7th Cir. 1992), that "the requesting officer's belief that there is sufficient evidence

to detain a suspect must have been communicated to the officer performing the stop." *Id*. at 911. Thus, while the arresting officers need not know the facts underlying probable cause, they must at least know that other officers believe probable cause to exist. The CPD and DEA reports here do not say whether Hall and Rodriguez were told that there was probable cause to arrest Humphrey for suspected cocaine possession.

That gap in the reports does not matter because *Nafzger* adds that "when officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Ibid*. *Nafzger* therefore establishes a presumption that officers collaborating on an investigation are in regular contact. Put another way, *Nafzger* teaches that the collective knowledge doctrine "mutually impute[s]" the probable cause determination to all officers in those circumstances, even without "express testimony" to that effect. *Ibid*. The Seventh Circuit has repeatedly reaffirmed that principle. *See Torry v. City of Chicago*, 932 F.3d 579, 586 (7th Cir. 2019) (invoking the collective knowledge doctrine even though the police report did not "expressly note whether the investigators received [descriptions of the suspects]"); *United States v. Parra*, 402 F.3d 752, 765-66 (7th Cir. 2005) (same, where "[the] team of officers … worked together closely in monitoring the drug transaction," even though "we do not know who issued the order for [the suspect's] arrest and the precise information in the minds of the officers who carried it out"); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("[B]ecause Woods was in communication with the other task force officers at the scene, including Nelson, Woods's knowledge can be imputed to Nelson. It does not matter that we do not know what Nelson knew when he initiated Sawyer's arrest, because we do know what Woods knew.").

Here, the CPD and DEA reports make clear that Hall and Rodriguez were part of the team investigating the Pulphus DTO on the day in question, Doc. 348-1 at 1; Doc. 348-2 at 3, and they were plainly in close touch with Hatch and Malone, Doc. 348-1 at 2. Moreover, the CPD report states six times that details about the investigation were being "related via radio to members of [the] investigation" or simply "related," Doc. 348-1 at 2, further indicating that this was a coordinated effort involving the sharing of information among all the officers, including Hall and Rodriguez. Therefore, it is immaterial that Hall and Rodriguez were told that Humphrey had rolled through a stop sign and then cited that violation as the reason for stopping him. *Nafzger* and its progeny impute the entire team's knowledge of probable cause to Hall and Rodriguez so long as Hall and Rodriguez were part of the team and the team was in constant communication. There is no dispute that they were.

Humphrey argues in the alternative that an evidentiary hearing is necessary to examine the nature of Hall and Rodriguez's participation in the investigation and what precise information they were privy to. Doc. 359 at 6. Given the foregoing analysis, Humphrey is not entitled to an evidentiary hearing. As the Seventh Circuit has held:

> District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion. To obtain an evidentiary hearing relating to suppression of evidence, the defendant bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient. Instead, the defendant must present definite, specific, detailed, and nonconjectural facts that justify relief.

*Edgeworth*, 889 F.3d at 353-54 (internal quotation marks and citations omitted). Here, there are no material disputes of fact that could affect the outcome of the motion. Humphrey is narrowly correct that the police reports do not disclose how much information Hall and Rodriguez knew about Humphrey's conduct when they stopped him. But, as discussed, Hall and Rodriguez were

acting in objective reliance on instruction from other members of the team, and that is enough to impute the team's knowledge to them. No evidentiary hearing is required.

## Conclusion

Humphrey's motion to suppress or, in the alternative, for an evidentiary hearing is denied.

August 27, 2021

_____
United States District Judge